El Pueblo de Puerto Rico, demandante y apelado, *v.* Rosario Santos, José Natalí @ Cheo y Bernardo Oliver, acusados y apelantes.

No. 3029.—*Visto:* Febrero 16, 1927. *Resuelto:* Marzo 10, 1927.

Derecho Penal—Apelación y Error y Certiorari—Revisión—Cuestiones Discrecionales—Cuestiones Relativas a la Admisión de Pruebas—Examen

DE TESTIGOS—EXAMEN POR LA CORTE.—Cuando objetada la participación de un juez en el examen de testigos, éste desiste y demuestra no tener intención de ayudar el caso de El Pueblo, aún cuando las preguntas demuestren una tendencia argumentativa y agresiva, no habiéndose cometido abuso de discreción, procede confirmar la sentencia apelada.

SENTENCIA de *Roberto H. Todd, Jr.*, J. (Ponce), condenando a los acusados por delito de Asesinato en Segundo Grado. *Confirmada.*

*E. Ramos Antonini, Edelmiro Huertas,* y *Cipriano Olivieri,* abogados de los apelantes; *José E. Figueras,* abogado de *El Pueblo,* apelado.

EL JUEZ ASOCIADO SEÑOR HUTCHISON, emitió la opinión del tribunal.

Rosario Santos, José Natalí y Bernardo Oliver fueron convictos de un delito de asesinato en segundo grado, siendo sentenciados a 30, 20 y 10 años de presidio, respectivamente.

Ni Santos ni Natalí han radicado alegato alguno, y un examen detenido de los autos no arroja una base suficiente para la revocación, aunque la prueba contra Natalí y Oliver no es tan clara y convincente como pudiera desearse.

La acusación alega que Natalí y Oliver ayudaron a Santos en la comisión del delito imputádole a éste. Los diferentes grados de responsabilidad no solamente en lo que se refiere a Santos y los demás acusados, sino también en lo referente a Natalí y Oliver, y tal como fueron pesados por el juez de distrito, de acuerdo con la impresión que le hizo la prueba en conjunto, sin ayuda de sugestión o recomendación alguna por parte del jurado, quedan indicados claramente por las condenas impuestas, y especialmente, por el notable contraste entre la pena de diez años impuesta a Oliver y la de veinte años impuesta a Natalí.

El apelante Oliver, insiste en que la corte cometió error al repreguntarle en forma tal que tendía a crear prejuicio en la mente del jurado. El examen de repregunta de este acusado hecho por el fiscal y el juez sentenciador fué como sigue:

REPREGUNTAS DEL FISCAL

"P. ¿Cuando usted estaba al lado de la muertecita, usted dijo que qué era lo que pasaba allí, que qué era aquella fiesta?

"R. No, señor.

"P. ¿Por qué usted dijo eso?

"R. Yo estaba sentado al lado de la muertecita con un brazo puesto sobre el catre, conversando con una señora que estaba al lado.

"P. ¿Esa señora fué la que declaró aquí esta tarde?

"R. No, señor.

"P. ¿Una vestida de azul?.'

"R. No, señor; había muchas más allí.

"P. ¿Usted no dijo al lado de la muertecita que qué era lo que pasaba allí, que qué era aquella fiesta?

"R. No, señor.

"P. Y la señora le dijo: Cristiano, ¿usted no ve que lo que aquí hay es una muertecita, que esto es un velorio?

"R. No, señor, eso no lo hice.

"P. ¿Usted no cogió a Gutiérrez, usted y Natalí, después que éste le dió varias puñaladas y lo tiraron abajo?

"R. Nunca.

"P. ¿Usted, después de estar abajo Gutiérrez, no dijo: Ahí no, para el llano, para el llano?

"R. No, señor.

"P. ¿Por qué usted le dijo al policía que usted no sabía nada del cuchillo cuando el policía se presentó allí?

"R. No, señor; cuando el policía se presentó y me pidió el cuchillo, que Rosario Santos le dijo que yo lo tenía, en seguida se lo pregunté a José Natalí, que llegó con el policía, a ver si yo no le entrego el cuchillo inmediatamente, que fueron los únicos que se encontraban allí, el policía, José Natalí y yo, no había más nadie despierto.

"P. Cuando el policía le pidió el puñal, cuando el policía le dijo a usted que Santos le decía que usted tenía el puñal, ¿es o no verdad de que usted le dijo al policía que usted no tenía el puñal?

"Defensor Ramos: Nosotros vamos a oponernos a la pregunta porque para nada ha sido objeto de interrogatorio directo ni se ha preguntado nada sobre eso.

"Juez: La Corte declara sin lugar la objeción.

"Defensor: Tomamos excepción respetuosamente.

"P. ¿Por qué cuando el policía fué donde usted y le dijo que

Santos decía que usted tenía el puñal con el cual se había dado muerte a Gutiérrez, usted le negó al policía que tenía el puñal?

"Defensor: No se ha sentado con el testigo que él haya negado nada; tiene que preguntarle si le negó para sobre eso levantarse la pregunta.

"Juez: La defensa le ha preguntado en el interrogatorio directo y él ha contestado en la forma en que entregó el cuchillo. Se permite la pregunta.

"Defensor: Tomamos excepción.

"R. Yo no le negué que tenía el puñal.

"P. ¿Usted se lo entregó voluntariamente?

"R. Voluntariamente.

"P. ¿Cuando vino el policía?

"R. Sí, señor.

"P. ¿Usted le dijo al policía quién le había entregado el puñal ése a usted?

"R. Sí, señor; porque Rosario Santos me dijo a mí que el cuchillo ése era el que lo habían herido a él, con el que había muerto Floro Gutiérrez y Rosario Santos se lo dijo al policía, que yo tenía el cuchillo.

"P. ¿Dónde fué que usted encontró el cuchillo ése?

"R. Ahí mismo, en la misma reunión, había mucha gente.

"P. ¿De dónde usted lo cogió?

"R. Ahí mismo.

"P. ¿Dónde?

"R. Cuando yo cogí a Rosario Santos para sacarlo abajo para afuera, apareció un muchacho con el cuchillo, ya el otro estaba muerto.

"P. ¿Qué le dijo el muchacho?

"R. Entonces Rosario Santos dijo: ese cuchillo es con el que me han herido a mí; entonces yo le dije al muchacho: trae acá ese cuchillo; y me dijo Rosario Santos: Coge ese cuchillo y guárdalo para que se lo entregue a la policía.

"P. ¿Ud lo limpió?

"R. No, señor.

"P. No lo lavó?

"R. No, señor, no.

"P. ¿Estaba lleno de sangre ese cuchillo?

"R. Sí, señor.

"P. Y cuando usted se lo entregó al policía, ¿estaba lleno de sangre?

"R. Se había secado, porque yo se lo dí a un chiquito que lo guardara en casa y parece que lo guardó en un fogón; como los muchachos guardan las cosas donde quiera. . . .

"P. Cuando usted salió del sitio, ¿usted dejó muerto a Gutiérrez?

"R. Sí, señor, cuando llegué al sitio ya estaba muerto.

"¿Entonces usted no vió la pelea?

"R. No la ví.

"P. Dónde estaba usted?

"R. Yo estaba en el cuarto del velorio.

"P. ¿En el cuarto de la niñita?

"R. En el cuarto de la niñita.

"P. ¿Y dónde empezó la pelea?

"R. La pelea fué en la sala, pero la gente que estaba en la sala transcurrió para el cuarto y taparon la puerta y luego se formó allí un volcán de José Pacheco y la gente que estaba allí y yo me arrimé a una esquina y cuando salí a la sala, ya habían caído abajo, y cuando llegué donde ellos ya Floro Gutiérrez estaba muerto.

"P. ¿Así es que no vió la pelea?

"R. No, señor.

### INTERROGATORIO HECHO POR EL JUEZ:

"P. ¿Qué hizo usted con el cuchillo cuando llegó a su casa?

"R. Pues lo cogí y lo guardé.

"P. ¿Dónde lo guardó?

"R. Se lo dí a un chiquito que lo guardara.

"P. ¿Entonces, no lo guardó usted?

"R. Sí, en mi mismo cuarto.

"P. ¿Usted no lo guardó entonces?

"R. Lo guardó un chiquito mío.

"P. ¿Hijo suyo?

"R. Hijo mío.

"P. ¿Dónde lo guardó?

"R. Lo guardó en la cocina.

"P. ¿En qué sitio de la cocina?

"R. Eso no le puedo decir, porque cuando yo llamé al chiquito y se levantó el chiquito, que llegó el policía, dijo: Papá, voy a buscar el cuchillo: y digo: vete, búscalo, y en lo que yo me puse los zapatos, apareció el chiquito con el cuchillo.

"P. ¿Usted no acaba de declarar que el muchacho lo puso en el fogón y la sangre se había secado cuando llegó el policía?

"R. Sí, señor.

"P. ¿Por qué dice que no sabe dónde lo guardó?

"R. Que lo guardó en la cocina, no sé si en el fogón.

"P. ¿Tenía ceniza el cuchillo o no tenía?

"R. El cuchillo no tenía ceniza, por eso le digo que no sé si fué en el fogón.

"P. Mi pregunta es si tenía ceniza o no tenía.

"R. No tenía, yo no reparé.

"P. ¿Tenía sangre o no tenía?

"R. Cuando yo lo cogí en mis manos tenía sangre.

"P. Cuando llegó el policía, le estoy preguntando.

"R. Estaba seco.

"P. ¿Y no tenía ceniza?

"R. No reparé.

"P. ¿Entonces estaba el cuchillo limpio?

"R. Yo no reparé.

"P. Usted dice que no tenía sangre, que no tenía ceniza, pues tiene que haber reparado en qué estado estaba el cuchillo: ¿estaba limpio el cuchillo?

"R. Estaba seco, porque yo cogí el cuchillo, el chiquito se paró así y yo cogí el cuchillo y se lo pasé al policía y no reparé lo que tenía.

"P. ¿Entonces no tenía sangre?

"R. Cuando lo cogí la primera vez tenía sangre.

"P. ¿Cuando llegó el policía?

"R. No reparé si tenía sangre o no tenía.

"P. ¿Cómo ha dicho antes que no tenía sangre?

"R. Por eso le digo que no reparé si tenía sangre o no, porque el muchacho fué el que guardó el cuchillo.

"P. A qué hora llegó usted a su casa?

"R. Yo llegué como a las once.

"P. ¿Como a las once del día o de la noche?

"R. De la noche.

"P. ¿Con quién usted vino?

"R. Yo llegué allá solo a mi casa.

"P. ¿Con quién usted vive?

"R. Yo vivo en el pueblo.

"P. ¿Ya estaban acostados cuando usted llegó?

"R. Ya estaban acostados.

"P. ¿Usted se acostó cuando llegó?

"R. Sí, señor.

"P. ¿Y como a qué tiempo después llegó el policía?

"R. Como una hora, como a las doce de la noche llegó el policía.

"P. ¿Y cuando llegó el policía, lo despertó a usted, lo llamó a usted?

."R. Me llamó a mí, sí señor.

"P. Si todos estaban durmiendo cuando usted llegó y se acostó, ¿usted levantó al chiquito y le dió el cuchillo?

"R. El chiquito venía conmigo del cine, iba conmigo del cine y estaba en un cafetín allí al lado.

"P. ¿Estaba esperándolo en un cafetín?

"R. Allí al frente.

"P. ¿Y usted le dió el cuchillo al chiquito?

"R. Cuando llegué a casa lo cogí y lo guardó.

"P. Usted se lo dió al chiquito para guardarlo?

"R. Sí, señor.

"P. ¿No lo guardó usted?

"R. No, señor; él.

"P. ¿Un cuchillo con el que había ocurrido un hecho de sangre usted se lo dió a un chiquito para que lo guardara?

"R. A un chiquito hijo mío.

"Defensor Olivieri: Nosotros queremos tomar excepción a todas las preguntas de la Corte, porque más que preguntas de un juez parecen preguntas de un fiscal.

"Juez: La Corte tiene derecho a hacer preguntas para el esclarecimiento de un hecho, igual que los defensores, el fiscal y los señores del jurado.

"Defensor Huertas: Queremos fundamentar más la excepción expresamente de que el Juez tiene autoridad para aclarar, de acuerdo con la ley, cualquier punto oscuro para sus instrucciones o para el conocimiento del jurado, pero nunca para involucrar a un testigo en una forma y contradecirlo.

"Juez: La Corte lo único que ha hecho precisamente es esclarecer un punto oscuro que había en relación con el cuchillo, de quién lo había guardado y la forma en que se encontró a la hora o media hora después cuando llegó lo policía."

En respuesta a la contención del apelante en cuanto a lo impropio del examen de repreguntas hecho por el juez sentenciador, el fiscal cita del caso de *El Pueblo* v. *Morales,* (a) *Yare Yare,* 14 D.P.R. 234, lo siguiente: "Aunque el examen de los testigos debe dejarse generalmente al cuidado

de los abogados, la corte, no obstante, puede interrogarles con el fin de aclarar los puntos esenciales y permitirle preparar sus instrucciones.''

En el caso de *El Pueblo* v. *Acevedo,* 35 D.P.R. 966, la opinión emitida por el juez que suscribe, con la cual estuvo conforme el Juez Asociado Sr. Wolf, contiene la siguiente indicación respecto a la mejor práctica a seguir, en ausencia de circunstancias que justifiquen una desviación de la regla general:

"El derecho de un juez de distrito a participar en el examen de los testigos, siempre que tal derecho se mantenga dentro de los límites razonables de una sana discreción judicial, no puede negarse y ha sido uniformemente sostenido por esta corte. En ausencia de presentar objeción o tomar excepción un ligero exceso en este respecto no garantizaría que se revocara la sentencia.

"Sin embargo, el conducir un caso por parte del Pueblo, especialmente en juicios por jurado, debe dejarse al fiscal. De lo contrario una intervención excesiva por parte de la corte en el curso general de las preguntas y comentarios hechos a favor de la acusación, produciría prejuicio en la mente del jurado contra el acusado y cuando se considera en relación con otras circunstancias del caso podría conducir a la conclusión inevitable en apelación de que al acusado no se le dió un juicio justo e imparcial.''

En el presente caso, la objeción levantada por el abogado fué oportuna y propia, pero el juez sentenciador prontamente desistió, y, en efecto, demostró no tener intención alguna de ayudar el caso de El Pueblo. Si bien la pregunta hecha por la corte demuestra una tendencia argumentativa y agresiva, sin embargo, hasta el momento de hacerse la objeción no hallamos que se haya cometido abuso alguno de discreción que justifique la revocación.

En el examen de repregunta de los testigos de descargo en un caso criminal, especialmente tratándose del mismo acusado, es bueno recordar que aunque un acusado que se sienta en la silla de los testigos se somete a la repregunta al igual que cualquier otro testigo, no obstante, preguntas que se-

rían enteramente propias en boca de un fiscal, pueden perjudicar al acusado cuando se hacen por el juez. Un mayor grado de descuido a este respecto que el que indica el extracto de la transcripción taquigráfica, *supra,* al ser objetado, como en el presente caso, o cuando está unido a otras circunstancias, no dejaría a esta corte otra alternativa que la de revocar el caso, cuando de lo contrario podría evitarse al gobierno el incurrir en los gastos y contingencias de un segundo juicio.

Sin embargo, tomándolo todo en consideración en el presente caso, no podemos llegar a la conclusión de que se perjudicara alguno de los derechos substanciales del acusado. Las instrucciones fueron amplias y completas, así como justas e imparciales.

Si aceptamos como ciertas las declaraciones de dos testigos, como fueron aceptadas por el jurado, ellas son suficientes para sostener el veredicto.

*Debe confirmarse la sentencia apelada.*